**Marc P. Berger**
**Sanjay Wadhwa**
**John O. Enright**
**Victor Suthammanont**
**Jon Daniels**
**Bennett Ellenbogen**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-5674 (Suthammanont)**
**Email: SuthammanontV@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

-- against --

**ERAN EYAL and UNITEDDATA, INC. d/b/a "SHOPIN,"**

**Defendants.**

---

**19 Civ. ____ ( )**

**ECF Case**

<u>**COMPLAINT**</u>
<u>**AND JURY DEMAND**</u>

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Eran Eyal ("Eyal") and UnitedData, Inc. d/b/a "Shopin" ("Shopin," and collectively with Eyal, "Defendants") alleges as follows:

<u>**SUMMARY OF THE ALLEGATIONS**</u>

1.      From August 2017 to April 2018, Shopin and its chief executive officer Eyal conducted a fraudulent and unregistered offering of digital securities raising at least $42.5 million in digital assets. Eyal and Shopin raised the funds by making material misrepresentations and omissions about the unregistered digital securities—called Shopin tokens—to investors during the offering.

2.      Shopin aimed to create a universal shopper profile that would track customer purchase history across online retailers and recommend products based on this information. The data comprising the shopper profile would be placed on the blockchain. Shopin was the successor company to an earlier entity with a similar business plan, which was failing when Eyal took control of it. Eyal started the offering to raise capital for the struggling business.

3.      Defendants conducted the fraudulent and unregistered offering in two stages: first, a "pre-sale" of tokens to wealthy investors, individuals, and investment syndicates beginning in August 2017; and second, a sale of tokens to the general public during an initial coin offering ("ICO") beginning in March 2018 and ending in April 2018. Here, the Shopin tokens constituted investment contracts and, thus, securities. Both stages of the offering involved investors in the United States.

4.      The offering was an illegal offering—there was no registration statement filed or in effect for the offers and sales of the Shopin token and no exemption from registration applied.

5.      In addition, Eyal and Shopin made at least four misrepresentations in marketing the Shopin tokens to investors. First, Defendants falsely claimed that Shopin had recently completed two successful pilots of the Shopin application at major retailers. Second, Defendants falsely claimed that Shopin had ongoing partnerships with numerous prominent retailers and was receiving steady monthly payments from those retailers. Third, Defendants falsely listed a prominent Silicon Valley blockchain entrepreneur as an advisor to Shopin in Shopin's marketing materials. Fourth, Eyal misleadingly suggested that a successful online company was an investor in Shopin. As the Defendants knew or recklessly disregarded, these statements were all false.

6.      In addition to these misrepresentations, Eyal improperly used proceeds from the unregistered and fraudulent Shopin offering to pay for personal expenses and to satisfy a legal judgment against Shopin's predecessor entity.

## VIOLATIONS

7.      By engaging in the conduct set forth in this Complaint, Defendants engaged in securities fraud in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and in the unregistered offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

8.      Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint, and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

9.      The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (d)(5)] seeking a final judgment: (a) permanently restraining and enjoining Defendants Eyal and Shopin from engaging in the acts, practices, and courses of business alleged herein; (b) requiring Eyal and Shopin to disgorge ill-gotten gains and to pay prejudgment interest thereon; (c) imposing civil money penalties on Eyal and Shopin pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) prohibiting Eyal, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.

§ 78u(d)(2)], from acting as an officer or director of any public company; and (e) prohibiting Eyal and Shopin from participating in any offering of digital-asset securities pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

11.     Venue is proper in the Southern District of New York pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other things, Defendants conducted much of the activity alleged in this complaint in this District, including by meeting with investors and potential investors in this District, using digital-asset trading platforms based in this District, making false and misleading statements to investors while in this District, and conducting a fraudulent scheme to the public at large in this District.

## DEFENDANTS

12.     **Eyal**, age 44, is a dual citizen of South Africa and Israel who resides in Brooklyn, New York. Starting in June 2017, Eyal was the chief executive officer and sole director of Passo Sync, Inc. ("Passo"), the predecessor company to Shopin, and Eyal was the founder and chief executive officer of Shopin. Eyal was charged in August 2018 by the New York State Attorney General for allegedly stealing $600,000 in funds raised from investors he solicited in an offering of convertible notes issued by his company Springleap, Inc.

4

13.     **Shopin** was incorporated in Delaware as UnitedData, Inc. in August 2017. It is

the successor company to Passo. In or about the fall of 2017 (the "Transition Period"), Eyal

transferred Passo's assets, business model, and operations to Shopin. Shopin describes itself as

"the world's first decentralized shopper profile built on the blockchain."

14.     Eyal dominated Shopin and Passo such that they were his alter egos, and Shopin

and Passo were alter egos, at all relevant times. Because Eyal operated the companies

interchangeably and as alter egos during the Transition Period, and because he transferred funds

illegally obtained by Passo to Shopin, any acts or references to Passo are attributable to Shopin.

## RELATED INDIVIDUALS AND ENTITY

15.     **Passo** was a corporation organized under the laws of Delaware in October 2013,

with its principal office in New York, New York. Passo's assets, business model, and operations

were transferred to Shopin.

16.     **Executive-1** was the co-founder and chief executive officer of Passo from its

founding until Eyal took over the company in June 2017.

17.     **Entrepreneur-1** is a well-known personality in the digital-asset field who

founded several successful start-up companies and who oversaw one of the largest ICOs in 2017.

## BACKGROUND ON DIGITAL TOKENS OR COINS

18.     An ICO is a fundraising event in which an entity offers participants a unique

"coin" or "token" issued on a "blockchain" or cryptographically-secured ledger, in exchange for

consideration (often in the form of digital assets or fiat currency).[1]

---

[1]     A blockchain is a type of distributed ledger, or peer-to-peer database spread across a
network, that records all transactions in the network in unchangeable, digitally-recorded data
packages called blocks. Each block contains a batch of records of transactions, including a
timestamp and a reference to the previous block, linking the blocks together in a chain. The

19.     ICOs are typically announced and promoted through public online channels. To participate, investors are generally required to transfer funds to the issuer's address, online wallet, payment processor, or other account. During or after the completion of the ICO, the issuer will distribute its unique coin or token to the participants' unique address on the blockchain. In some instances, the coins or tokens may continue to be offered and sold by the issuer after the ICO has been completed. Often the tokens trade in secondary markets.

## FACTS

### A.     Eyal Takes Over a Failing Business

20.     Passo was a private company that claimed to provide a personal online shopping profile that would track customers' preferences across different retail platforms and make recommendations based on this information. Passo's ability to contract with popular retailers willing to integrate with Passo's customer profiles was key to its business.

21.     Eyal was an early investor in Passo before becoming an advisor to the company in 2015 and then joining it as a full-time employee in October 2016. At the time, Executive-1 was Passo's chief executive.

22.     By June 2017, Passo was struggling to stay in business. The company, Eyal, and Executive-1 were defendants in a lawsuit filed by a Passo investor in May 2017 alleging that it had fraudulently induced its investment by falsely claiming to have a partnership with a prominent retail company and seeking return of his $350,000 investment. Further, Passo had not paid its employees for nearly two months and owed them nearly $100,000 as a result.

---

system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

23.     On June 21, 2017, several Passo investors emailed Executive-1, copying Eyal, concerning a number of alleged improprieties by Executive-1. Eyal responded to the Passo investors that he had also "recorded evidence of fraud" regarding Executive-1. Eyal and the Passo investors considered reporting Executive-1 to law enforcement for embezzlement and securities fraud, given allegations that Executive-1 had "induced investors by presenting false information," including "executed contracts with retail clients" that apparently contained "significant information that was untrue."

24.     On June 26, 2017, Executive-1 resigned from Passo and Eyal took over as its chief executive officer and sole director. Executive-1 provided to Eyal information about Passo that demonstrated the extent of Passo's financial difficulties, including that Passo owed money to the disgruntled investor and back pay to Passo employees. Eyal also learned that Passo had no money in its bank accounts.

25.     In an effort to save Passo, Eyal sought investors to participate in a $1.8 million funding round, but the investor lawsuit was a deterrent to new investment—as was the fact that Passo did not have a functional product at the time. In light of the difficulties in raising new funds for Passo, Eyal explained to investors and potential investors that he had decided to "pivot to the blockchain" by transforming Passo into the company that ultimately became Shopin.

26.     In August 2017, Eyal began rebranding the company as an artificial-intelligence product-recommendation engine that used the Ethereum blockchain. Eyal also incorporated a new entity, Shopin, on August 24, 2017. Shortly thereafter, Eyal began transferring Passo's assets, business model, and operations to Shopin.

27.     The Defendants, in investor marketing materials, described Shopin as creating "a decentralized Amazon on the blockchain with a universal shopper profile and cryptocurrency for

retail and ecommerce." They stated in marketing materials and emails to investors and potential investors that the Shopin application would allow customers to create a universal shopper profile that would track information across numerous online retailers. The aggregated purchase history data would purportedly be used to create more accurate product recommendations and allow retailers to better target their marketing efforts. At the time, and indeed, through the completion of the ICO, Shopin did not have a functioning product.

**B.** **The Unregistered, Fraudulent Shopin Offering**

   *(a)*   *The Unregistered Pre-Sale and ICO*

28.     Defendants began the unregistered offering with a "pre-sale" of what became the Shopin token beginning in August 2017.

29.     In the pre-sale, the Defendants offered a purchase agreement styled as a "simple agreement for future tokens" ("SAFT"), in which they sold Shopin[2] tokens to be delivered to investors once Shopin created them at the completion of the public ICO.

30.     Investors in the Shopin token pre-sale executed the SAFTs, which stated, among other things, that the proceeds of the pre-sale would be used by Shopin to develop, launch, and market the Shopin network.

31.     The Defendants planned to create 1.5 billion Shopin tokens, 500 million of which would be offered in the pre-sale. Any unsold tokens from the 500 million reserved for the pre-sale would remain with the Shopin team and its advisors. An additional 500 million Shopin tokens would be offered during the public ICO.

32.     While the pre-sale was initially scheduled to end on October 14, 2017, the Defendants extended the formal end date through February 28, 2018, but continued to sell

---

[2]     Initial investors signed agreements to purchase "PassoCoin [name subject to change]".

afterward to certain investors concurrent with the public token sale. Following the conclusion of the public ICO, Shopin tokens were distributed to all investors—both pre-sale and public ICO purchasers—in May 2018. The Defendants did not file a registration statement with the Commission and did not state to investors that Shopin was seeking to rely on any relevant exemption or safe harbor from the Securities Act's registration requirements.

33.     The Defendants set the minimum investment during the pre-sale in varying amounts denominated in either dollars or in Ethereum tokens ("ETH"). The Defendants offered pre-sale investors a discount on the Shopin tokens to the price at which they would offer the tokens during the ICO and greater discounts for larger investment amounts. Ultimately, in addition to ETH, the Defendants accepted Bitcoin ("BTC") as payment during the pre-sale as well.

34.     Eyal had ultimate authority over and either drafted, reviewed, revised, or approved all of the marketing materials used in the offering, including revising and using Passo investor materials that he knew or should have known were false because of investor complaints about Executive-1's representations to investors in connection with Passo.

35.     During the offering, the Defendants raised approximately $42.5 million in ETH and BTC. All of the proceeds from the offering, including those proceeds raised using the Passo brand, were ultimately sent to Shopin or misappropriated by Eyal as described below.

   *(b)     Defendants Fail to Verify the Accredited Status of Shopin Investors*

36.     The Defendants failed to take reasonable steps to ensure that purchasers of the securities sold in the offering were accredited investors, as defined in Rule 501 of Regulation D to the Securities Act.

37.     As one example of this failure, Defendants were aware that investors were forming pools or syndicates—commonly called "ICO pools"—to participate in the pre-sale. The

purpose of these pools was to satisfy a token issuer's minimum investment and to take advantage of discounts for larger investment amounts. Despite knowing that ICO pools were investing in the Shopin token pre-sale, the Defendants did not attempt to identify the individual members of any ICO pool or to determine whether such investors were accredited investors.

38.     The Defendants also permitted certain investors to purchase securities without undertaking any accredited investor verification.

    *(c)*     *The Shopin Tokens Were Marketed as Securities*

39.     The Shopin tokens sold by Defendants were investment contracts and, thus, securities. For example, the SAFTs expressly noted the relationship between the investors' ability to profit from the sale of the Shopin token and the Defendants' efforts, stating that the

> Purchaser enters into this SAFT with the predominant expectation that (i) he, she or it, as the case may be, will profit upon the successful development and Network Launch arising from the efforts of the Company and its employees to develop and market the PassoCoin [name subject to change] Network, the Network launch and related sale of the Tokens.

40.     In addition, it is clear that purchasers would have reasonably expected to profit from Defendants' efforts and were therefore buying securities.

41.     *First*, the Shopin tokens involved an investment of money. The pre-sale purchasers paid digital currency—ETH or BTC—to receive tokens under the terms of the SAFT. The ICO purchasers also paid ETH or BTC to receive Shopin tokens.

42.     *Second*, the Defendants conveyed in company marketing materials and emails to investors and prospective investors that investors' funds would be pooled into a common enterprise. The Defendants provided specific digital wallet addresses where investor assets would be pooled and later transferred to company digital-asset wallets or bank accounts for use in funding the creation of the Shopin ecosystem. Shopin also tied the buyers' fortunes to its own

and trumpeted that fact by emphasizing in marketing materials that the company would keep a portion of the 500 million Shopin tokens offered in the pre-sale and thereby profit if those tokens—and, by definition, the buyers' tokens—appreciated in value. In addition, the Defendants' marketing materials for the pre-sale stated that Shopin was raising funds from investors for various purposes related to the completion of the Shopin network, such as "retain[ing] final team members" and developing "[m]arketing videos to consumers and retailers."

43.    *Third*, the Defendants led purchasers to expect profits from their Shopin token purchases because of the Defendants' efforts. Among other things, Defendants highlighted the prospect of profits, referring to "token appreciation" in marketing materials and touting to potential Shopin investors that Defendants' efforts at obtaining retailer and user adoption of Shopin's technology would increase the value of the token. In connection with the offering, the Defendants highlighted the company's management team, emphasized its distribution and sales strategy, and emphasized its revenue growth. Eyal told an investor in November 2017 that "the token price increase is the biggest incentive" for the purchase of the token.

44.    Defendants told investors that they intended to have the Shopin token listed on digital-asset trading platforms, which would allow investors to realize their profits when they wanted. For example, in a December 2017 email to investors and prospective investors, Eyal asked for the investors to assist in having the Shopin token on such trading platforms to promote liquidity. Eyal informed a potential investor in October 2017 that there would be no lock-up period so that the purchaser could resell his Shopin tokens immediately.

45.    Investors expected these profits to come from the efforts of Eyal and Shopin's employees. Throughout the Shopin token offering, Defendants touted the experience and abilities

11

of Shopin's management team and advisors and told people about critical, concrete steps that

Shopin would take to create the Shopin ecosystem (and thereby drive demand for the tokens). As

discussed above, Shopin detailed at least four essential tasks that it intended to undertake,

including (1) developing an artificial intelligence-powered recommendation system capable of

understanding style from visual and textual cues; (2) continuing to improve user profiles and

applications; (3) furthering research and development of its "blockchain solution"; and (4)

expanding its retailer and user network.

**C.    The Defendants' Misrepresentations in Connection with the Offering**

46.    During the unregistered offering, Eyal and Shopin made material

misrepresentations to investors concerning Shopin's application, the company's relationship with

retailers, a key advisor to the company, investors in the offering, and the use of the proceeds of

the offering. As described herein, Defendants knew or were reckless in not knowing that all of

these statements were false or misleading.

        *(a)    The False Pilot Programs*

47.    A critical selling point for Shopin was that the company had proven the utility of

the application it inherited from Passo in successful pilot programs Passo undertook with two

prominent retailers—Bed Bath & Beyond and Ermenegildo Zegna ("Zegna"). According to the

Defendants, during the pilots, approximately 719,000 of these retailers' customers had signed up

for the company's application following an offer from the retailers to do so. The customers then

purportedly shopped on a dedicated page at the retailers' websites. The Defendants' marketing

materials claimed that the pilots generated a combined $14.7 million in revenue for the retailers

in just 30 days—representing an approximately 22% "transactional conversion lift."

48.     In addition, the marketing materials stated that 72,000 Passo users from the pilots had subsequently shared their shopper profile, resulting in 65,000 new users over and above those registered in the pilots.

49.     The Defendants highlighted the purported success of the pilots on the company's website, the whitepaper used to market the Shopin offering, in communications with potential investors, and at a presentation Eyal gave at a major digital-asset conference.

50.     But as the Defendants knew or were reckless in not knowing, the pilots never occurred and the statements concerning them were false.

51.     As early as November 2017, Shopin employees raised concerns to Eyal that there was no support for the pilot-related claims in investor materials. In December 2017, another employee informed Eyal that there was no data supporting the claims concerning the pilot programs. Despite these red flags and concerns about the veracity of the claims concerning the pilot programs, Eyal and Shopin continued to tout the pilots in public statements and to potential investors until October 2018, when a news article was published calling them into further doubt.

52.     The Defendants also misled investors who inquired about the pilots. Eyal led investors to believe the Bed Bath & Beyond pilot existed and would continue in the future, for example by telling at least one potential investor that Bed Bath & Beyond had offered to continue the program, but Shopin had declined to focus on its "core technology"; and telling another that the program was "on hold" until Shopin further developed the technology for it. Eyal omitted the material fact that he never had any communications in which the retailer had offered to continue the program, let alone establish a future partnership.

53.     In response to other potential investors' questions about the pilots and whether data supporting them existed, Shopin employees misleadingly told those investors, including at

Eyal's direction, that non-disclosure agreements prohibited the company from providing evidence of the pilots or agreements with the retailers despite the lack of evidence of any such non-disclosure agreements.

      *(b)*      *The False Retailer Partnerships*

54.     In addition to the false pilot programs, the Defendants touted purported partnerships with numerous retailers in their marketing materials and emails to investors. This was an important selling point and the status of these partnerships was material to investors because it demonstrated that prominent companies were willing to adopt the Shopin technology, and because such partnerships were critical to the success of the entire Shopin business model. Moreover, the purported partnerships appeared to represent a stable source of revenue for the company.

55.     A presentation sent at Eyal's direction to one of the earliest investors in the offering in August 2017, for example, contained a representation that Passo was working with 13 prominent retailers, including Zegna, J. Crew, Kenneth Cole, Banana Republic, Gap, and Old Navy. The presentation explained that the retailers provided "guaranteed revenue" and were actively emailing their customers to become Passo users. It further stated that Passo had secured letters of intent and contracts for some of these retailers to integrate and market Passo at the launch of the application.

56.     Throughout the fall of 2017, in marketing emails to potential investors, Eyal repeatedly represented that retailers were paying Shopin between $15,000 and $50,000 per month on 18-month contracts.

57.     These claims were entirely false, as Eyal knew or was reckless in not knowing. As early as June 2017, in the face of investor inquiries about the partnerships, Eyal confirmed to an investor that he was trying to determine the validity of each partnership contract. He did not

validate any of the agreements with retailers, however. Further, Eyal admitted to other Shopin employees that the retail partnerships did not exist.

58.     Despite knowing that the retail partnerships did not exist, the Defendants continued to reference them in emails through November 2017. During this period in which they made those misleading statements, the Defendants raised more than $2 million.

        *(c)     The False Advisor Relationship*

59.     In addition to the misstatements concerning Shopin's business relationships with retailers, the Defendants also falsely promoted Entrepreneur-1 as an advisor to Shopin despite his express instruction to Eyal to remove him from Shopin's promotional materials.

60.     Entrepreneur-1, a prominent individual in the digital-asset field, served as an advisor to Passo. After Eyal formed Shopin and began to promote the successor company and the Shopin token, he continued to include Entrepreneur-1's name on marketing materials as an advisor.

61.     When Entrepreneur-1 became aware that the Defendants were listing him as an advisor to the new venture, he sent a text message to Eyal on September 27, 2017, and requested that Eyal remove him as an advisor. Eyal informed Entrepreneur-1 that he would do so and also promised to remove him from Shopin marketing materials.

62.     Despite this exchange with Entrepreneur-1, the Defendants continued to list him as an advisor for months afterward. For example, a week after the September 27, 2017 text exchange, Eyal emailed a potential investor that the management team was stronger than ever and listed Entrepreneur-1 as an advisor. The potential investor responded positively to the claimed inclusion of Entrepreneur-1 on the team.

63.     Between October 2017 and January 2018, the Defendants continued to tout Entrepreneur-1 as an advisor to Shopin, including in a November 2017 presentation at a major

blockchain conference in New York, which referred to a screenshot listing Entrepreneur-1 as an advisor.

    *(d)*    *The False ZocDoc Investment*

64.    In addition to the other misrepresentations, the Defendants also misleadingly suggested that ZocDoc—a well-known online company—was an investor in Shopin. For example, the company's whitepaper listed "Angel investors from" various companies, underneath which the ZocDoc logo appeared, misleadingly giving the impression that ZocDoc was an investor in Shopin.

65.    In fact, a product manager at ZocDoc had made an investment in Passo in August 2014. That same individual had left ZocDoc to form his own investment firm in June 2016. Therefore, at the time of the offering, neither ZocDoc, nor employees who worked at ZocDoc, had invested in Shopin, which Eyal knew or was reckless in not knowing.

**D.**    **The Defendants' Misuse of the Funds Raised in the Offering**

66.    According to marketing materials, the Defendants claimed that the funds raised in the offering would be used as follows: 50% for software engineering and data science; 30% for marketing expenses, sponsorships, and public relations; 15% business and corporate development; and 5% for legal and accounting expenses.

67.    Instead, Eyal and Shopin used portions of the offering proceeds for undisclosed and improper purposes. Defendants never disclosed to investors—notwithstanding the use-of-proceeds provision in the company's marketing materials—that funds raised in the Shopin token offering would be used to settle a $350,000 lawsuit brought against Eyal, Passo, and Executive-1. In addition, the Defendants never disclosed to investors that that investor funds would be used to pay for Eyal's personal expenses.

68.     As alleged above, Eyal, Passo, and Executive-1 were named as defendants in a lawsuit brought by a Passo investor alleging misrepresentations by them in connection with the investor's earlier investment in Passo. Defendants used Shopin investor funds to settle the Passo-related lawsuit, but omitted this material fact from the company's investor marketing materials.

69.     Moreover, Eyal commingled funds from the offering with his own personal funds, and used offering proceeds to pay for personal expenses. Eyal used over $500,000 of investor funds for expenses such as his rent, retail shopping, entertainment, tickets to philanthropic events, and a dating service, but omitted to disclose to investors that he would use any proceeds for his own benefit.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Both Defendants)**

70.     The Commission repeats, realleges and incorporates by reference paragraphs 1 through 69, as though fully set forth herein.

71.     By virtue of the foregoing, Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit; and Defendants made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.     By virtue of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

### SECOND CLAIM FOR RELIEF
**Violations of Securities Act Section 17(a)**
**(Both Defendants)**

73.     The Commission repeats, realleges and incorporates by reference paragraphs 1 through 69, as though fully set forth herein.

74.     By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) Defendants employed devices, schemes or artifices to defraud; (b) Defendants obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) Defendants engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

75.     By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Both Defendants)**

76.     The Commission repeats, realleges and incorporates by reference paragraphs 1 through 69, as though fully set forth herein.

77.     By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of

transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

78.     By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

## I.

A Final Judgment permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]; (ii) violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

A Final Judgment directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

## III.

A Final Judgment permanently barring Defendant Eyal from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## IV.

A Final Judgment prohibiting Defendants from participating in any offering of digital-asset securities pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

## V.

A Final Judgment directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## VI.

Such other and further relief as this Court deems appropriate and necessary for the benefit of investors.

### **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York
   December 11, 2019

       SECURITIES AND EXCHANGE COMMISSION

By: _____
     Marc P. Berger
     Sanjay Wadhwa
     John O. Enright
     Victor Suthammanont
     Jon Daniels
     Bennett Ellenbogen
     200 Vesey Street, Suite 400
     New York, New York 10281-1022
     (212) 336-5674 (Suthammanont)
     Email: SuthammanontV@sec.gov
     Attorneys for Plaintiff